THOMAS MCKENNA *vs.* GOULD WIRE CORD COMPANY.

Norfolk.   November 22, 1907. — February 27, 1908.

Present: KNOWLTON, C. J., HAMMOND, LORING, BRALEY, & RUGG, JJ.

*Negligence,* Employer's liability. *Evidence, Res gestae,* Admissions and confessions. *Agency.*

In an action by an engineer in a wire cord factory against his employer for personal injuries, it appeared that the plaintiff had worked as an engineer for eighteen or nineteen years and had been employed as an engineer in the defendant's factory for about eighteen months and at times had served as a helper to the superintendent, that the superintendent sent him to get something from a storeroom in the basement of the factory, which was low, dimly lighted and very noisy from machinery both there and on the floor above, that in order to go to the storeroom he had to stoop to pass under the shaft of a blower which was two and a half or three feet from the ground, that, when he passed under the shaft, it was not in motion, that on his return from the storeroom he attempted to pass under the shaft in the same way, but it had been started, by the superintendent who sent him to the basement, and was making three hundred and twenty revolutions a minute, that the light was so dim and the noise so great that the plaintiff did not see or hear that the shaft was in motion, and had heard no signal of its starting given by a bell or orally, and as he stooped to go under the shaft two set screws in the coupling of the shaft caught the clothing at the back of

---

his neck and he was whirled around the shaft and was injured. There was a regulation that this shafting should not be started without a signal being given by an electric bell or orally, but the plaintiff testified that while he was in the basement he was not within hearing distance of the bell. It appeared that the blower was used to heat the factory, and that the accident happened in mid-winter. The plaintiff testified that while the blower was in use, through the cold weather, he had to go down into that part of the basement half a dozen times a day to change the steam, that he oiled the bearing on the blower sometimes once a day and sometimes once in two or three days, that the blower was about twelve feet from the shaft, that he knew the shaft was there, but never had been close to it and had no knowledge that there was a coupling on it that had projecting set screws. *Held*, that as matter of law the plaintiff could not recover, the dim light and the noise in the basement and the set screws in the coupling of the shaft being permanent and obvious conditions of his employment, with which he was or might have been familiar, and of which he accepted the risk; moreover, that there was no evidence of negligence on the part of the superintendent in starting the shafting of the blower when he had sent the plaintiff to the basement, as he reasonably could not have been expected to foresee that an experienced employee so often in this part of the basement would not be guided by his usual experience at this season of the year as to finding the blower shaft in motion; and that whether the signal by electric bell or orally was given or not was immaterial, as the plaintiff could not have relied on the absence of the signal, knowing that he was where he could not hear it if given.

In an action by an engineer in a factory against his employer for personal injuries alleged to have been caused by the negligence of a superintendent of the defendant in starting a blower with a revolving shaft in the basement of the factory, after he had sent the plaintiff there on an errand which compelled him to pass under the revolving shaft by stooping, in doing which he was caught by fixed screws on the shaft and was injured, the plaintiff's wife testified that, immediately after the injury to her husband and before he was removed from the factory she had a conversation with the defendant's superintendent, and the plaintiff offered to show that the superintendent then stated to the witness that if he, the superintendent, had not been so lazy the accident never would have occurred. The statement did not tend to contradict any testimony of the superintendent. The judge excluded the evidence. *Held*, that the exclusion was right; that the statement was not a part of the *res gestae*, being a mere narration of a past event, and was not admissible as an admission because it was not within the scope of the authority of the superintendent.

TORT for personal injuries, with counts at common law and under the employers' liability act. Writ dated May 14, 1903.

In the Superior Court the case was tried before *Bell*, J. The plaintiff was injured on December 26, 1902, in the basement of the defendant's wire cord factory at Hyde Park, situated on a lot of land which slopes from River Street to a stream called Mother Brook. The main basement was about one hundred feet long by fifty feet wide, its floor being the natural ground, which sloped downward from the front wall of the basement to the

rear. On the floor above were over three hundred machines which were used in the business of manufacturing wire cord. In the basement were many shafts, counter shafts, belts and pulleys, besides brick piers, pipes and a blower. A storeroom was in one corner. There was but little head room in any part of the basement, but there was more near the rear wall on account of the slope of the land. There was evidence that in no part of the basement could a man stand upright but had to walk in a crouching position; that the light in the basement was dim, and that the machines above and the shafting, belts and pulleys below made the basement very noisy. One McSweeney was a superintendent of the defendant, within the meaning of the employers' liability act.

The plaintiff testified as follows: On December 26, 1902, he was in the employ of the defendant at its factory as an engineer, and had been so employed for about eighteen months previously, and at times served as helper to the superintendent, McSweeney, in addition to his duties as engineer. The engine room was a shed attached to the basement in the rear of the building. About nine o'clock in the morning of the day of the injury, he was ordered by McSweeney to go into the basement and get for him, from the storeroom in the further corner, two cakes of wax which were used in the work, each cake being about eighteen inches square and four inches thick. In the presence of the superintendent and pursuant to his direction, the plaintiff went downstairs, following the only way there was at that time, passed through the engine room, then through a door into the basement, and along a path trodden in the ground, and along a plank walk, stooping under a shaft connected with a blower. The shaft was not in motion when he was ordered to the basement, or when he went under it on the way to get the wax, and he supposed it was in the same condition when he was coming back. Only the superintendent, or one Gould, a son of the president of the company, operated this shafting. Gould was not at the factory that day. There was a regulation that this shafting should not be started without a signal given by an electric bell or orally. The plaintiff did not hear any signal while he was in the basement. He got the wax and, while immediately coming back by the same route, stooped to go under the shaft, when

something which he afterwards ascertained to be set screws in the coupling on the shaft caught him by the clothing at the back of his neck and he was whirled around and around the shaft and was injured.   The plaintiff was not aware that the shafting was in operation when he stooped to go under the shaft; the light was so dim that he could not see that it was in motion, and the three hundred or more machines on the floor above, and the shafting, belts and pulleys in the basement made so much noise he could not hear it running.   No signal had been given to him, and the superintendent who had sent him to the storeroom was the only one there that day who operated this shafting.   The plaintiff did not know that there were set screws projecting from the coupling.   The shafting was set in motion from the floor above, near where the superintendent was when he ordered him to go into the basement.

On cross-examination the plaintiff testified that he had worked as an engineer for about eighteen or nineteen years, that while the blower was in use, through the cold weather, he had to go down into that part of the basement half a dozen times a day; that he went there to change the steam; that he oiled the bearing on the blower; that the bearing on the blower was about twelve feet from the shaft; that he knew the shaft was there, but he had never been close to it; that he had never had anything to do with shafting practically, that an engineer's duties do not require that; that a little piece of shafting might have been in the engine room, such as for driving a pump or something of that sort, — that that had been his limit; that the shaft on which he was injured was two and one half or three feet from the ground; that he oiled the bearing on the blower sometimes once a day and sometimes once in two or three days; that there was a lamp and a lantern in the engine room but no chimney for them; that the blower was about twelve feet from the shaft; that he started up the power about six o'clock every morning, and part of the machinery would run continuously throughout the day, but the blower machine did not; that the purpose of the blower was to heat the building; that McSweeney, the superintendent, and Gould ran the blower; that the only time the plaintiff had anything to do with it was in the morning after the return got hot he would go up

stairs and shift the belt over, and after that McSweeney or Gould would take care of it, starting it up or stopping it as they liked; that he never had anything to do with the blower, except as described; that he never had been for wax in the basement before the time he was injured; that he had been down to put on the steam at half past six that morning within twelve feet of the shaft and that he did not take a lamp or a lantern.

On re-direct examination the plaintiff testified that there was a little window about fifteen feet away from the shaft, and at the shaft the light was very dim; that one could see hardly anything; that McSweeney had charge of the machinery; that the blower was not running when the plaintiff went down for the wax; that he passed the blower on his way to get the wax and before reaching the shaft which he went under; that the plaintiff did not hear any oral signal that the blower was to be started; and that while in the basement he was not within hearing distance of the bell. The plaintiff, on being recalled, testified that at the time he was hurt, or any time before, he had no knowledge of there being a coupling that had set screw projections, in the basement. In reply to a question by the judge he stated that on his engine there was one set screw to hold the key.

The wife of the plaintiff testified that immediately after the injury to her husband, and before he was removed from the factory, she had a conversation with the defendant's superintendent, McSweeney. The plaintiff offered to show that the superintendent then stated to the witness that if he, the superintendent, had not been so lazy the accident never would have occurred. The judge excluded this evidence, and the plaintiff excepted.

At the close of the plaintiff's evidence, the judge ruled that the plaintiff could not recover, and ordered a verdict for the defendant. The plaintiff alleged exceptions.

*J. E. Cotter,* (*E. C. Jenney* with him,) for the plaintiff.

*J. A. Lowell,* (*J. Lowell* with him,) for the defendant.

RUGG, J.    There is nothing in the circumstances of this action to distinguish it in principle from the many other set screw cases in which defendants have been held not liable for injuries re-

ceived by an employee.  The subject has been so recently and
fully discussed, with ample review and citation of authorities,
in *Mutter* v. *Lawrence Manuf. Co.* 195 Mass. 517, that it is un-
profitable now to traverse the ground again.  Touching the dim
light and necessity of stooping to go under the shaft, it can only
be said that these were permanent conditions, obvious to the
eye, and with which the plaintiff was or might have been
familiar, and which were the same at the beginning of the
plaintiff's employment as at the time of the accident.  There
was no legal obligation on the part of the employer to change
his structure, although it would thereby have been rendered
safer.  One of the implied terms of the contract of employment
was that the work should be performed with the permanent
arrangements then existing.  *Gleason* v. *Smith*, 172 Mass. 50.
*Lemoine* v. *Aldrich*, 177 Mass. 89.  *Chisholm* v. *Donovan*, 188
Mass. 378.  The Legislature has made ample provision for the
remedy of such unwholesome conditions as appear to have
existed in the defendant's factory, but no step seems to have
been taken to enforce liability under the statute.  R. L. c. 104,
§§ 41 and 50 (see now St. 1907, c. 503, § 2, c. 537, § 5).  *Foley*
v. *Pettee Machine Works*, 149 Mass. 294.

The plaintiff was injured by the shaft of the blower which
was started by the superintendent after he had sent the plaintiff
on the errand, on his return from which he was hurt.  It may
be assumed that the act of starting the blower, upon all the evi-
dence, was an act of superintendence.  *McPhee* v. *New England
Structural Co.* 188 Mass. 141.  Although it was customary to
announce, by oral or electric signal, the starting of the blower,
yet this must have been for some other purpose than that of
warning those in the basement that it was about to start, for
the conditions were such that the usual warning could not be
heard there.  Therefore the plaintiff could not have relied upon
its being given, and *Carroll* v. *New York, New Haven, & Hartford
Railroad*, 182 Mass. 237, and cases of that class are not in point.
The plaintiff testified that while the blower was in use in cold
weather he was in the part of the basement where he went just
before the accident " half a dozen times a day."  The accident
happened on December 26, and was therefore at a season of the
year when this machine, which was for heating the factory, must

have been constantly in use. In view of these circumstances it cannot be said that the superintendent was negligent in starting the blower. He could not reasonably have been expected to foresee that an experienced employee so often in this part of the basement would not guide himself by his usual experience at this season of the year in finding the blower shaft in motion.

The evidence as to the statement of the superintendent shortly after the accident was excluded properly. It was a mere narration of a past event, not tending to contradict anything he had said in testimony, nor was it within the scope of his authority. *McDonough* v. *Boston Elevated Railway,* 191 Mass. 509. *McNicholas* v. *New England Tel. & Tel. Co.* 196 Mass. 138.

*Exceptions overruled.*